UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

REPORT AND RECOMMENDATION

* * * * * * * * * * * * * * * * * * *

Walter Neal Bowman,

                    Plaintiff,

        vs.

Michael J. Astrue, Commissioner
of Social Security,

                    Defendant.                Civ. No. 07-4940 (RHK/RLE)

* * * * * * * * * * * * * * * * * * *

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB").  The matter is now before the Court upon the parties' cross-Motions

for Summary Judgment.  The Plaintiff has appeared by Edward C. Olson, Esq., and

the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Plaintiff's Motion for Summary

Judgment be denied, that the Defendant's Motion for Summary Judgment be denied, and that this matter be remanded to the Commissioner for further proceedings, in accordance with this Report.

## II.  Procedural History.

The Plaintiff applied for Disability Insurance Benefits ("DIB"), on February 23, 2006, alleging that he had been disabled since February 16, 2005.  [T. 68].   The Plaintiff met the insured status requirements at the alleged onset date of disability, and he remains insured for DIB through December 31, 2009.  [T. 14].

On May 18, 2006, the State Agency denied his application upon initial review, and upon reconsideration.  [T. 21-24, 34].   The Plaintiff requested a timely Hearing before an Administrative Law Judge ("ALJ") and, on June 19, 2007, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by counsel.  [T. 38, 222-44].   Thereafter, on July 26, 2007, the ALJ issued a decision denying the Plaintiff's claim for benefits.  [T. 12-19].   On September 27, 2007, the Plaintiff requested an Administrative Review before the Appeals Council.  [T. 8].   However, on November 1, 2007, the Appeals Council denied the Plaintiff's claim for review.  [T. 4-6].   Thus, the ALJ's determination became the final decision of the Commissioner.  See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr

v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

### III.  Administrative Record

A.  Factual Background.  The Plaintiff was fifty-eight (58) years old on the date of the Hearing.  [T. 21].  The Plaintiff is right-handed, [T. 227], and he has completed college, and holds several professional certificates to work in the brokerage industry.  [T. 229].  The Plaintiff has past relevant work experience as an office manager, but has been unable to work since February 16, 2005.  [T. 90-91].  The Plaintiff alleges that he cannot work due to an intrasellar pituitary adenoma, fatigue, and vision loss in his left eye.[1]  [T. 23, 90].

1.  Medical Records.  On December 18, 2002, the Plaintiff was seen by Walter Galicich, M.D. ("Dr. Galicich"), for a follow-up evaluation of his pituitary adenoma.  [T. 125].  During that evaluation, the Plaintiff had a  magnetic resonance imaging ("MRI")  study of his head, which revealed that the tumor was growing, and

---

[1]An adenoma is a "benign epithelial tumor in which the cells form recognizable glandular structures or in which the cells are clearly derived from glandular epithelium."  Dorland's Illustrated Medical Dictionary, at 29 (31st Ed. 2007).

compressing the left side of the optic chiasm.[2] Id. The tumor also extended into the

spehnoid sinus.[3] Id. The Plaintiff was then admitted to Abbott Northwestern Hospital

("Abbott Northwestern"), in Minneapolis, Minnesota, for surgery. Id.        O    n

December 27, 2002, prior to his scheduled surgery, the Plaintiff completed a pre-

operative history and physical. [T. 127]. The Plaintiff reported that he had a prior

transsphenodial resection performed in 1995.[4] Id. He also stated that he was taking

Prednisone, Synthroid, and Androgel.[5] Id. The doctor also noted that the Plaintiff

suffered from blurry vision, and nasal congestion. [T. 128].

---

[2]The optic chiasm is "the part of the hypothalamus formed by the * * * crossing, of the fibers of the optic nerve from the medial half of each retina." Dorland's Illustrated Medical Dictionary, at 348 (31st Ed. 2007).

[3]The spehnoid sinus is "one of the paired paranasal sinuses in the anterior part of the body of the spehnoid bone[.]"   Dorland's Illustrated Medical Dictionary, at 1746 (31st Ed. 2007).

[4]A transsphenodial procedure is "performed through the sphenoid bone." Dorland's Illustrated Medical Dictionary, at 1982 (31st Ed. 2007).

[5]Prednisone is a "synthetic glucocorticoid derived from cortisol, administered orally as an antiinflammatory and immunosuppressant in a wide variety of disorders." Dorland's Illustrated Medical Dictionary, at 1531 (31st Ed. 2007). Synthroid is "a preparation of levothyroxine sodium." Id. at 1879. Levothyroxine sodium is "used as replacement therapy for hypothyroidism[.]" Id. at 1046. Androgel is used "for replacement therapy in males for conditions associated with a deficiency or absence of endogeous testosterone[.]" Physician's Desk Reference, at 3267 (62nd Ed. 2008).

On December 31, 2002, the Plaintiff underwent an MRI, and a skull radiograph. [T. 129-30]. Mark C. Oswood, M.D. ("Dr. Oswood"), reviewed the Plaintiff's MRI, and found a three (3) centimeter mass within the Plaintiff's sella, which was consistent with his known pituitary adenoma.[6] [T. 129]. The mass extended into the suprasellar region, with mild mass effect on the optic chiasm.[7] Id. Dr. Oswood also reviewed the Plaintiff's skull radiographs, and noted a marked enlargement of the sellar turcica, which was also consistent with the Plaintiff's pituitary adenoma. [T. 130].

On that same date, Dr. Galicich performed the Plaintiff's transphenoidal hypophysectomy.[8] [T. 131]. Dr. Galicich removed a large portion, but not all, of the Plaintiff's tumor, and inserted and opened a catheter. [T. 132-33]. Dr. Galicich reported that the surgery had no complications. [T. 133]. A portion of the pituitary tumor was sent to pathology for testing, which confirmed that the tumor was a

---

[6]Sella pertains to the sella turcica which is "a transverse depression crossing the midline on the superior surface of the body of the spehnoid bone and containing the [pituitary gland]." Dorland's Illustrated Medical Dictionary, at 1714 (31st Ed. 2007).

[7]Suprasellar is above or over "the sella turcica." Dorland's Illustrated Medical Dictionary, at 1833 (31st Ed. 2007).

[8]A hypophysectomy is "surgical removal or destruction of the hypophysis (pituitary gland)." Dorland's Illustrated Medical Dictionary, at 917 (31st Ed. 2007).

recurrent pituitary adenoma.  [T. 134].  On January 3, 2003, John W. Jones, M.D.,

concluded that the tumor's pathology was consistent with the tumor that had been

removed in 1995, which was positive for thyroid stimulating hormone, follicle

stimulating hormone, and luteinizing hormone.[9]  [T. 135].

On January 7, 2003, the Plaintiff had a final examination, before his discharge

from Abbott Northwestern.  Id.  The Plaintiff was directed to refrain from blowing his

nose, to avoid excessive activity, and to refrain from lifting anything heavier than five

(5) to ten (10) pounds.  Id.  The Plaintiff was also scheduled for a follow-up cranial

MRI, as well as an appointment with Wayne F. Leebaw, M.D. ("Dr. Leebaw"), the

Plaintiff's endocrinologist, and with Dr. Galicich to discuss potential radiosurgery.[10]

Id.  The Plaintiff was written a prescription for hydrocortisone, Percocet, and Pepcid,

and provided one (1) tablet of Senokot S.[11]  Id.

---

[9]Luteinizing hormone works to promote the secretion of androgens, and progesterone. See, Dorland's Illustrated Medical Dictionary, at 882 (31st Ed. 2007).

[10]Radiosurgery is "surgery in which tissue destruction is by means of ionizing radiation rather than surgical incision[.]"  Dorland's Illustrated Medical Dictionary, at 1597 (31st Ed. 2007).

[11]Hydrocortisone is used for its "antiinflammatory and immunosuppressant properties." Dorland's Illustrated Medical Dictionary, at 890 (31st Ed. 2007). Percocet
(continued...)

On January 13, 2003, the Plaintiff underwent a cranial MRI. [T. 136]. Surgical changes, which were consistent with the Plaintiff's transsphenodial pituitary surgery, were observed when compared to the Plaintiff's pre-operative MRI. Id. The sella was enlarged, and contained a mass measuring three (3) centimeters by three (3) centimeters by two (2) centimeters, which was later determined to be the Plaintiff's pituitary adenoma. Id. There was also a mild mass effect on the left optic chiasm. [T. 136-37].

On February 6, 2004, the Plaintiff was seen at the Lakeview Clinic by Timothy M. Grangaard, M.D. ("Dr. Grangaard"). [T. 139]. The Plaintiff reported that his head had been congested for three (3) to four (4) days, and that he had popping in his ears, itchy, watery eyes, and a runny nose. Id. He also stated that he felt tired, but only for the past three (3) days. Id. The Plaintiff was still taking Prednisone, Synthroid, and Androgel. Id. Dr. Leebaw informed Dr. Grangaard that he was concerned about the Plaintiff's hormonal status and spermatogenesis, and Dr. Leebaw recommended a

---

[11](...continued)
is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, at 1126 (62nd Ed. 2008). Pepcid is used for the short-term treatment, and maintenance, of ulcers and gastroesophageal reflux disease. Id. at 2051. Senokot is a "natural vegetable laxative" that "relieves occasional constipation." Physician's Desk Reference, at 2717 (60th Ed. 2006).

semen analysis be performed if the Plaintiff's medications were decreased.[12] Id. The

Plaintiff was given samples of Zyrtec-D, and he agreed to a semen analysis.[13] Id.

On April 1, 2004, the Plaintiff was seen at the Endocrinology Clinic, in

Minneapolis, Minnesota, by Dr. Leebaw. [T. 167]. The Plaintiff reported that he felt

lethargic, especially at the end of the day, or week. Id. He also stated that his energy

levels had worsened since his previous visit. Id. Dr. Leebaw noted that the Plaintiff's

testosterone level had been mildly low in January of 2004, but he was unsure if the

low testosterone could account for the Plaintiff's symptoms. Id. Other than the

Plaintiff's low energy levels, he was doing well, but he had decided to defer radiation

treatment for his pituitary tumor, because of his fatigue. Id. Dr. Leebaw informed the

Plaintiff that he could not delay radiation treatment much longer, because of the

tumor's ongoing growth. Id.

---

[12]Spermatogenesis is "the process of formation of spermatozoa." Dorland's Illustrated Medical Dictionary, at 1796 (31st Ed. 2007).

[13]Zyrtec-D tablets are used "for the relief of nasal and non-nasal symptoms associated with seasonal or perennial allergic rhinitis in adults and children 12 years of age and older." Physician's Desk Reference, at 2588 (62nd Ed. 2008).

On April 7, 2004, the Plaintiff was seen at the Lakeview Clinic by Kurt A. Brattain, M.D. [T. 140]. The Plaintiff complained of feeling fatigued and low on energy. Id. The Plaintiff was directed to schedule an MRI of his head, and to follow-up with his endocrinologist. Id. On April 8, 2004, the Plaintiff had an MRI performed on his head, at Ridgeview Medical Center, in Waconia, Minnesota. [T. 144]. The MRI showed a mass within the sella turcica, which extended into the sphenoid sinus, and the cavernous sinuses bilaterally. Id. There was also mass effect on the left optic chiasm. Id. The mass was determined to be consistent with the Plaintiff's pituitary adenoma, and it appeared to be stable. Id.

On May 20, 2004, the Plaintiff returned to the Lakeview Clinic, and complained of fatigue. Id. However, he reported that he had recently seen his endocrinologist, and that his laboratory tests were normal. Id.

On May 20, 2004, Dr. Grangaard examined the Plaintiff, who complained of feeling tired and sleepy. [T. 141]. The Plaintiff admitted sleeping at inappropriate times -- like when he was driving -- and stated that his son reported that he snored quite frequently, and vigorously. Id. However, the Plaintiff's recent follow-up with his endocrinologist, and his recent MRI of his head, displayed no change in his condition. Id. Dr. Grangaard further noted that "apparently things are going well."

Id.  Nonetheless, after hearing the Plaintiff's complaints, Dr. Grangaard concluded that the Plaintiff suffered from a sleep disorder, and recommended a sleep study.  Id.

On October 11, 2004, the Plaintiff was seen at the Endocrinology Clinic for a six (6) month follow-up for his hypopituitarism, and  tumor, with Dr. Leebaw.[14]  [T. 165].  The Plaintiff reported that his replacement medication had him feeling quite well.  Id.  He also stated that he was sleeping well, and that his energy level was good, and he denied any symptoms of hyperthyroidism, hypothyroidism, or glucocorticoid deficiency, such as fatigue, muscle weakness, or lightheadness.[15]  Id.

On February 7, 2005, the Plaintiff returned to the Lakeview Clinic to see Dr. Grangaard.  [T. 141].  He stated that, for the past four (4) days, he had experienced disorientation, coughing, congestion, several episodes of diarrhea and vomiting, and

---

[14]Hypopituitarism is the "diminution or cessation of function of the [anterior lobe of the pituitary gland] due to surgical removal, to ablation by irradiation, or to spontaneous causes[.]"  Dorland's Illustrated Medical Dictionary, at 890 (31st Ed. 2007).

[15]Hyperthyroidism is "a condition caused by excessive production of iodinated thyroid hormones[.]" Dorland's Illustrated Medical Dictionary, at 890 (31st Ed. 2007). Hypothyroidism is a "deficiency of thyroid activity."  Id. at 920. Glucocorticoids are "any of the corticosteroids (steroids produced by the adrenal cortex) that regulate carbohydrate, lipid, and protein metabolism and inhibit the release of corticotropin." Id. at 800.

a decrease in energy.  Id.  Dr. Grangaard concluded that the Plaintiff was suffering

from the flu, and he noted that the symptoms appeared to be resolving.  [T. 142].

On February 9, 2005, the Plaintiff had an MRI performed on his head.  [T. 145].

The MRI disclosed no significant change in the size of the tumor, when compared to

the Plaintiff's MRI of April 4, 2004.  Id.  However, the mass was still compressing on

the left side of the optic chiasm, and on the pre-chiasmatic optic nerve.  Id.  On March

28, 2005, Dr. Grangaard examined the Plaintiff.  [T. 143].  The Plaintiff was not

depressed, but he was feeling decreased energy levels.  Id.  He had recently lost his

job, and was unsure whether he would apply for DIB.  Id.  Dr. Grangaard concluded

that the Plaintiff should be examined by an endocrinologist, and a neurosurgeon,

because his recent MRI did not show any change in his pituitary tumor.  Id.  Notably,

the Plaintiff's thyroid stimulating hormone was normal, and his testosterone levels

were unremarkable.  Id.  Dr. Grangaard believed that an increase in Prednisone could

improve the Plaintiff's condition, and he directed the Plaintiff to double his dosage.

Id.

On April 27, 2005, the Plaintiff was seen by Dr. Galicich.  [T. 160].  Dr.

Galicich noted that the Plaintiff's MRI showed a large pituitary tumor with

compression of the optic chiasm.  Id.  However, the Plaintiff reported no changes in his vision.  Id.

On April 28, 2005, the Plaintiff was seen at the Endocrinology Clinic by Dr. Leebaw.  [T. 163-64].  The Plaintiff reported that he was doing well, except he felt low on energy.  [T. 163].  Dr. Leebaw noted that the Plaintiff had a history of sleep apnea, but had discontinued his use of his continuous positive airway pressure ("CPAP") machine, because he could not tolerate it.  Id.  Dr. Leebaw also advised that he was reluctant to treat the Plaintiff with growth hormone, if indeed, he did suffer from growth hormone deficiency, because it was likely contraindicated by his pituitary tumor, and sleep apnea.  [T. 164].

On May 4, 2005, the Plaintiff was seen at Ophthalmology, P.A., in Edina, Minnesota, by Paul F. Bruer, M.D. ("Dr. Bruer").  [T. 149].  Dr. Bruer found that the Plaintiff's recurrent pituitary tumor was compressing the Plaintiff's left optic nerve, and causing optic atrophy.  [T. 152].  He also concluded that the tumor's compression was causing the Plaintiff's left eye vision loss.  Id.  Despite that conclusion, Dr. Bruer reported that the Plaintiff's vision was 20/15 in his right eye, and 20/50 in his left eye. Id.

On December 15, 2005, the Plaintiff was seen by Paul W. Sperduto, M.D. ("Dr. Sperduto"), a Radiation Oncologist.  [T.155-57].  Dr. Sperduto had previously seen the Plaintiff in September of 2003, in order to discuss radiation therapy but, at that time, the Plaintiff decided to defer treatment.  [T. 155].  Dr. Sperduto reviewed Dr. Bruer's examination results, including the visual field cut, and determined that the left medial visual cut had worsened since the Plaintiff's last examination.  Id.  However, at that visit, the Plaintiff reported no change in his vision.  Id.  After reviewing the Plaintiff's MRI from February 9, 2005, Dr. Sperduto recommended surgery, followed by radiation therapy.  [T. 156].  Dr. Sperduto referred the Plaintiff to Dr. Galicich to discuss the possibility of surgery, and he ordered a new brain MRI.  Id.

On January 11, 2006, the Plaintiff was seen at Neurosurgical Associates by Dr. Galicich.  [T. 158].  Although the Plaintiff had a stable loss of the central degrees of vision in his left eye, he reported no changes in his visual field over the last few years.  Id.  He also reported no visual loss in his right eye, and he stated that he had fairly good peripheral vision in his left and right eyes.  Id.  Dr. Galicich reviewed the Plaintiff's recent MRI, and concurred with Dr. Sperduto, that surgery was the only adequate way to decompress the Plaintiff's optic nerve.  Id.  The Plaintiff was also told that any surgery would likely have to be followed up with radiation treatment.

[T. 159].  The Plaintiff decided to wait for further visual testing before proceeding with surgery.  Id.

On March 16, 2006, the Plaintiff complained of ringing in his ears, during the past five (5) weeks.  [T. 200].  However, upon examination, Dr. Grangaard found no hearing loss or vertigo.  Id.

On September 27, 2006, the Plaintiff was seen by Dana Erickson, M.D. ("Dr. Erickson"), at the Mayo Clinic, in Rochester, Minnesota, for a consultative examination concerning the Plaintiff's recurrent pituitary tumor.  [T. 213].  The Plaintiff informed Dr. Erickson that he had not noticed a reduction in his visual field, and that he was only experiencing mild headaches in the middle of his head.  Id.  However, during that visit, Dr. Erickson was unable to review the Plaintiff's past MRIs, in order to determine whether the Plaintiff's pituitary tumor had grown.  [T. 213].  The Plaintiff also stated that he was suffering from reduced energy levels, and muscle fatigue.  [T. 214].  Dr. Erickson noted that the Plaintiff reported "[s]ome concentration ability problems but these were more pronounced after the first surgery and he was told that it was a reaction to possibly anesthetics."  Id.  Dr. Erickson also directed that the Plaintiff's hormone levels be checked.  [T. 215].  Lastly, Dr. Erickson

noted that the Plaintiff's sleep apnea could be a factor in the Plaintiff's fatigue, and he recommended a sleep clinic study.  Id.

The next day,  Dr. Erickson reviewed the Plaintiff's MRI, and found a large recurrent tumor centered within the sella, extending and expanding to the floor of the sella and into the sphenoid sinus.  [T. 210]. The mass extended into the Plaintiff's suprasellar cistern, and caused an elevation of the left intracranial optic nerve.[16] Id. The Plaintiff also had cortisol of less than one (1).[17] Id.  As a result, Dr. Erickson recommended hydrocortisone, and the Plaintiff agreed to try it.  Id.  After his examination, Dr. Erickson determined that the Plaintiff was ready for surgery.  Id.

On October 3, 2006, the Plaintiff was seen by Dr. Grangaard for a preoperative physical examination, in anticipation of his pituitary adenoma resection.  [T. 198]. The Plaintiff continued to have a mild visual field cut to the left, and he was experiencing intermittent fatigue.  Id.  Dr. Grangaard also noted that the Plaintiff

---

[16]A cistern is "a close space serving as a reservoir for fluid."  Dorland's Illustrated Medical Dictionary, at 372 (31st Ed. 2007).

[17]Cortisol is a glucocorticoid which affects "the metabolism of glucose, protein, and fats and has appreciable mineralocorticoid activity."  Dorland's Illustrated Medical Dictionary, at 429 (31st Ed. 2007).

- 15 -

suffered from sleep apnea, but the Plaintiff was not interested in pursuing surgery.  Id.

On October 10, 2006, the Plaintiff was admitted to St. Mary's Hospital, at the Mayo Clinic, in Rochester, Minnesota, for a transphenoidal resection of his recurrent pituitary adenoma.  [T. 202].  Portions of the Plaintiff's tumor were removed, and later pathology reports confirmed a recurrent pituitary adenoma.  [T. 207-09].

On April 12, 2007, the Plaintiff returned to Dr. Grangaard for a disability evaluation.  [T. 197].  After reviewing his consultative notes, and examining the Plaintiff, Dr. Grangaard concluded that the Plaintiff met the requirements for a disability.  Id.  However, Dr. Grangaard noted that the Plaintiff might be able to regain his former energy levels, and that the Plaintiff's fatigue could be related to other conditions, such as depression.  Id.  In fact, Dr. Grangaard began the Plaintiff on a trial pack of Effexor.[18]  Id.

On that same date, Dr. Grangaard sent a letter to the Plaintiff's counsel, in which he stated that the Plaintiff suffered from a pituitary adenoma, and had undergone several surgeries due to the adenoma's recurrence.  [T. 195].  He noted that

--------

[18]Effexor is "indicated for the treatment of major depressive disorder." Physician's Desk Reference, at 3359 (62nd Ed. 2008).

the Plaintiff suffered from several side-effects, such as hypothyroidism, hypopituitarism, and decreased testosterone levels. <u>Id.</u> He also stated that the Plaintiff had difficulty sleeping, and had decreased energy levels. <u>Id.</u> Dr. Grangaard concluded that the Plaintiff met "the criteria of not having enough concentration, attention, and persistent symptoms to perform activities consistent with semi-skilled work." <u>Id.</u> However, Dr. Grangaard added that he had informed the Plaintiff "that this does not preclude evaluation for possible other problems to explain his fatigue, and that we should continue to look for these and treat them as aggressively [] in the hopes that he may improve ." <u>Id.</u>

2.    <u>Assessments</u>.  On May 16, 2006, Maria Gumbinas, M.D.  ("Dr. Gumbinas"), who is a neurologist, conducted a Residual Functional Capacity ("RFC") Assessment.  [T. 169-77].  Dr. Gumbinas concluded that the Plaintiff could push and pull without limitation, occasionally lift twenty (20) pounds, frequently lift ten (10) pounds, and stand, walk, or sit, for six (6) hours out of an eight (8) hour day.  [T. 170]. Dr. Gumbinas also found that the Plaintiff could frequently balance, occasionally climb a ramp or stairs, and stoop, kneel, crouch, or crawl, although he was unable to climb a ladder, rope, or scaffolds.  [T. 171].  Dr. Gumbinas also concluded that the Plaintiff should avoid even moderate exposure to hazards, such as machinery and

- 17 -

heights.  [T. 173].  Dr. Gumbinas did not find that the Plaintiff would have any other

limitations.  [T. 172-73].  She observed that the Plaintiff had visual changes in his left

eye, although his neurological examination was otherwise unremarkable.  [T. 177].

Dr. Gumbinas further noted that the Plaintiff complained of fatigue, and had been

diagnosed with sleep apnea.  Id.  She found that the Plaintiff suffered from a large

pituitary tumor, and from significant fatigue, which may have been aggravated by his

sleep apnea.  Id.  Dr. Gumbinas concluded that the Plaintiff's fatigue was severe,  but

not a listing level impairment.  Id.

On June 29, 2006, another RFC Assessment was conducted by Jeffrey D.

Gorman, M.D. ("Dr. Gorman").  [T. 187-94].  Dr. Gorman noted that Dr. Gumbinas

had not considered the Plaintiff's visual restrictions, so Dr. Gorman incorporated the

Plaintiff's visual restrictions into his conclusions.  [T. 188].  Dr. Gorman found that

the Plaintiff could push and pull without limitation, occasionally lift twenty (20)

pounds, frequently lift ten (10) pounds, and stand, walk, or sit, for six (6) hours out

of an eight (8) hour day.  Id.  Dr. Gorman also found that the Plaintiff could frequently

balance, occasionally climb a ramp or stairs, and stoop, kneel, crouch, or crawl,

although the Plaintiff was unable to climb a ladder, rope or scaffolds.  [T. 189].  Dr.

Gorman also found that the Plaintiff had a limited field of vision, but that his other

visual functions were unlimited.  [T. 190].  Dr. Gorman concluded that the Plaintiff should avoid even moderate exposure to hazards such as machinery and heights.  [T. 191].  Dr. Gorman found no other limitations.  [T. 190-91].  According to Dr. Gorman, the Plaintiff suffered from a medically determinable impairment, that the severity or duration of his symptoms was consistent with that impairment, and that his symptoms and functional limitations were consistent with the evidence.  [T. 192].

B.  <u>Hearing Testimony</u>.  The Hearing on June 19, 2007, commenced with some opening remarks by the ALJ, in which he noted the brief procedural history of the Plaintiff's claims, and the appearances of the parties.  [T. 224-25].  The ALJ then swore the Plaintiff, and the Vocational Expert ("VE"), to testify.  [T. 223, 225-26].  The Plaintiff's counsel opened by advising the ALJ that the Plaintiff had earned $98,000.00 in 2005, and $68,000.00 in 2006, but that those earnings were from the exercise of stock options from the Plaintiff's former employer, and were not from work related activity.  [T. 226].  The ALJ then began his questioning of the Plaintiff.  [T. 226-27].

The Plaintiff stated that he was right-handed, approximately five (5) feet, eleven (11) inches tall, and weighed one hundred ninety-five (195) pounds.  [T. 227].  At the time of the Hearing, the Plaintiff was divorced, and lived with his nineteen-year-old

son, who had graduated from high school, but was then unemployed.  [T. 227-28].

The Plaintiff stated that he had exercised the last of his stock options in April of 2007,

and that he had no income at the time of the Hearing.  [T. 228].  Aside from his stock

options, the Plaintiff had no other income from work since February 16, 2005.  [T.

229].

The Plaintiff testified that he finished college, and that he held several

professional certifications to work in the brokerage industry.  [T. 229-30].  However,

the Plaintiff had no past work experience as a broker, because he worked as an office

manager, and as an office principal.  [T. 230].

The Plaintiff stated that, on an average day, he was only able to care for himself

and his son.  [T. 230].  The Plaintiff testified that his symptoms varied from day to

day, and he stated that he had developed sleep apnea as a result of his three (3)

neurological surgeries.  Id.  He admitted that he was not using his CPAP machine, as

he was unable to sleep while wearing that machine's mask.  [T. 231].  The Plaintiff

stated that he was only able to sleep at intermittent points through the day and night.

Id.  He also was unsure of his sleep apnea measurements, because he was not able to

fall asleep during his sleep study.  Id.

The Plaintiff testified that his last surgery had occurred in October of 2006. [T. 232]. He added that his tumor was benign, but could still grow back without metastasizing to other areas of the body. Id. The Plaintiff recounted that he had similar surgeries in February of 1995, and in December of 2002. Id.

The Plaintiff reported that he had a small cerebrospinal fluid leak during his surgery in October of 2006, but that he believed the leak had healed. Id. However, the Plaintiff admitted that he had not had a follow-up examination, in order to see if the leak had healed, or if his tumor was regrowing, because his medical benefits had ended in October of 2006. [T. 232-33]. The Plaintiff acknowledged that, if tests revealed that the tumor was regrowing, he would have to consider radiation treatment. Id.

Aside from his tumor, the Plaintiff testified that he had lost forty (40) to sixty (60) percent of his visual acuity, and visual field, in his left eye. [T. 233-34]. The Plaintiff testified that the visual field in his left eye was very limited towards the nasal area, and that he was unable to read with his left eye. [T.234]. The vision in his right eye remained unaffected and, as a result, he used his right eye to read and drive. Id. However, he stated that he still had some peripheral vision in his left eye. [T. 235].

- 21 -

The Plaintiff testified that his former employer had terminated his employment as a result of downsizing.  Id.  However, he also disclosed that he had been found sleeping in his office, and his termination of his employment followed.  Id.

The ALJ referred to Dr. Bruer's report of May of 2005, which recorded that the Plaintiff had vision acuity of 20/15 in his right eye, and 20/50 in his left, and he asked whether the Plaintiff believed that those results were above average.  [T. 235-36].  The Plaintiff agreed that those results were above average, and he testified that there had been no change in his vision since that examination.  [T. 236].  The Plaintiff further testified that he did not rely on his vision problems to determine whether his tumor was regrowing.  Id.  He explained that the tumor would eventually impact his left optic nerve, but that it was more likely to erode the wall between his pituitary chamber, and the chamber where spinal fluid forms.  Id.

Although he experienced sleepiness, the Plaintiff testified that his sleepiness was only one symptom from his pituary surgery, and his hormone replacement therapy.  [T. 237].  He explained that fatigue was a common side-effect from his course of treatment, even in those individuals who sleep normally.  Id.  In addition, the Plaintiff stated that his endocrinologist was hopeful that hormone replacement

therapy, specifically growth hormone, would help with his fatigue, although the Plaintiff was not taking growth hormone at the time of the Hearing.  Id.

Next, the Plaintiff admitted that he had only briefly attempted to find other employment, because he did not believe that he could handle an eight (8) hour work day, or have the enthusiasm required for a new position.  [T. 237-38].

The ALJ then began his questioning of the VE.  [T. 238].  The ALJ asked if the Plaintiff's testimony had changed the VE's conclusions, and the VE reported no changes in his conclusions.  [T. 239].

The ALJ then posed a hypothetical, by asking the VE to assume a male individual with at least sixteen (16) years of education, an age range of fifty-five (55) to fifty-eight (58) years, with the Plaintiff's past work history, who suffered from a large, non-functioning pituitary adenoma, which had been treated three (3) times with surgery, and who had been diagnosed with obstructive sleep apnea without treatment, vision problems, and fatigue, but who was able to do light duty work, described as lifting not more than twenty (20) pounds occasionally, and ten (10) pounds frequently. [T. 239-40].  The ALJ then asked the VE if that hypothetical individual could perform the Plaintiff's past work, and the VE verified that the individual could not.  [T. 240].

Thereafter, the ALJ modified the hypothetical in order to assume an individual who could not meet high production goals because of fatigue, and who could not work on an assembly line, where he would have to maintain a constant pace with other employees. [T. 240]. The VE responded that the individual could not perform the Plaintiff's past work, because it likely had high production goals. [T. 241].

The ALJ again modified the hypothetical to assume an individual who was limited to semiskilled work, because of his reduced level of concentration. [T. 241]. The VE testified that the hypothetical individual could not perform the Plaintiff's past work. Id.

Next, the ALJ asked the VE if there were skills from the Plaintiff's past employment, which could be transferred to other work within the restrictions of the final modified hypothetical. Id. The VE responded that the Plaintiff had developed basic computer keyboarding skills in his past employment, which would allow the individual to perform light duty or sedentary, semiskilled work, including the positions of a skip tracer, or a shipping order clerk. Id. The VE also testified that an individual could transfer those skills gained, with little or no vocational adjustment. [T. 241-42].

The ALJ then asked the VE if there were other jobs in the national economy, which could be performed by an individual with those limitations.  [T. 242].  The VE explained that the individual could work as a skip tracer, and that 2,200 such positions existed in the State of Minnesota, or the individual could work as a shipping order clerk, and that 1,700 to 1,900 jobs existed in the State of Minnesota.  Id.

The Plaintiff's counsel then asked the VE if it was correct that an individual would be restricted to unskilled work, if he was not capable of maintaining the attention, concentration, persistence, and pace, required by semiskilled work.  [T. 242-43].  The VE agreed with that statement.  [T. 243].  The Plaintiff's counsel then asked whether the Plaintiff's computer keyboarding skills would transfer to unskilled work, and the VE replied that they would not transfer to unskilled work.  Id.

C.    The ALJ's Decision.  The ALJ issued his decision on July 26, 2007.  [T. 12-19].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by Title 20 C.F.R. §404.1520.[19]  The ALJ first found that the

---

[19]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a
> "substantial gainful activity;" (2) whether the claimant has
> a severe impairment that significantly limits the claimant's
> (continued...)

- 25 -

Plaintiff last met the insured status requirements for a period of disability, and DIB, on December 31, 2009.  [T. 14].  The ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 16, 2005. Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity.  [T. 14].  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ concluded that the Plaintiff was severely impaired by

---

[19](...continued)
> physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

hypopituitarism, secondary to a non-functioning pituitary adenoma, status post-treatment with three (3) surgical procedures, as well as a left visual field cut, and obstructive sleep apnea.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, Title 20 C.F.R. §404.1520(d).   The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based upon the Record as a whole.  [T. 15].   He noted that the Plaintiff's laboratory testing demonstrated signs of normal thyroid function, and that the Plaintiff had no neurological deficits.  Id.  Although the Plaintiff had loss of visual field in his left eye, the ALJ noted that the Plaintiff had normal vision in his right eye.  Id.

The ALJ proceeded to determine whether the Plaintiff retained the RFC to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy. Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated

to consider all of the Plaintiff's symptoms, including the Plaintiff's subjective complaints of fatigue, and that those complaints were to be evaluated under the standard enunciated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the Hearing, the opinions of the Plaintiff's treating physicians, the opinions of the impartial VE, the objective medical evidence, and the Plaintiff's subjective complaints of fatigue, the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to perform light work except that he is limited to semiskilled positions which do not require high production goals or fast pace.

[T. 15].

In determining the Plaintiff's RFC, the ALJ first considered the testimony of the Plaintiff, that he had great difficulty sleeping, was not able to use his left eye for reading, and suffered from significant fatigue which made him unable to work an eight (8) hour work day.  [T. 16].  The ALJ concluded that the Plaintiff's medically determinable impairments could be expected to produce his alleged symptoms, but he found that the Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms, were not entirely credible.  [T. 16].

He also observed that the Plaintiff's symptoms were stable with medical treatment, and that there were no findings of neurological deficits.  Id.  He noted that the Plaintiff had vision loss in his left eye, with  normal vision in his right eye.  Id. He further noted that the Plaintiff's treating physician admitted that the Plaintiff's pituitary tumor might not be the cause of his fatigue.  Id.

The ALJ then observed that the Plaintiff had been diagnosed with obstructive sleep apnea, but that he refused to use a CPAP machine, and had not pursued any other medical treatment for that condition.  Id.  The ALJ concluded that the Plaintiff's daytime fatigue could be attributable to his sleep apnea, and found that his refusal to seek out medical treatment detracted from the believability of his subjective complaints of fatigue.  Id.  The ALJ also noted that the Plaintiff's "very strong work record" did not outweigh the rest of the evidence, which demonstrated normal hormone levels, and a stable medical condition.  Id.

Next, the ALJ considered the opinion evidence of Dr. Grangaard.  [T. 17].  He observed that, in April of 2007, Dr. Grangaard reported that the Plaintiff lacked the attention, concentration, and persistence, that would be necessary to perform full-time, semiskilled work.  Id.  However, the ALJ declined to give controlling weight to Dr. Grangaard's opinion, because the doctor had admitted that the Plaintiff's pituitary

tumor may not be the cause of the Plaintiff's fatigue, and because the Plaintiff's laboratory tests, and examinations, had demonstrated that the Plaintiff's condition was stable, aside from the loss of vision in his left eye. Id.

The ALJ then considered the opinions of the State Agency medical consultants who had evaluated the Plaintiff's functional limitations. Id. He gave those opinions little weight, because the State Agency medical consultants had not considered the opinion of Dr. Grangaard, or the treatment notes from Mayo Clinic. Id.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff was not capable of performing his past relevant work as an office manager, which was a highly skilled position. Id. However, the ALJ recounted the VE's testimony, that the Plaintiff had acquired the skill of computer keyboarding from his past relevant work. Id.

Proceeding to the Fifth Step, the ALJ concluded that a significant number of jobs existed, in the national economy, which the Plaintiff could perform. Id. The ALJ recounted the VE's testimony, that persons with the same age, education, past relevant work experience, and functional limitations, and who retained the skills acquired in the Plaintiff's past work, but no additional skills, could work as a skip tracer, and as a shipping clerk. [T. 18]. The ALJ also noted that, according to the VE,

approximately 2,200 skip tracer jobs, and 1,700 shipping clerk positions, existed in the State of Minnesota.  Id.  The ALJ also observed that the VE's testimony was consistent with information obtained in the Dictionary of Occupational Titles, with the exception of production requirements.  Id.  However, the VE had testified that, on the basis of his professional experience, the position of skip tracer, and shipping clerk, did not have high production goals.  Id.  Although the ALJ noted that the Plaintiff's additional limitations did not permit him to perform the full range of light-duty work, the ALJ found the VE's testimony to be credible, and persuasive, and he concluded that there existed a significant number of jobs that the Plaintiff could perform.  Id.  As a result, the ALJ concluded that the Plaintiff was not disabled.  Id.

## IV.  Discussion

A.    Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n. 6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).

Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because

we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d

1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore,

is deferential, and we neither reweigh the evidence, nor review the factual record <u>de

novo</u>.  See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v.

Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir.

1996).

      B.   <u>Legal Analysis</u>.  In support of his Motion for Summary Judgment, the

Plaintiff advances the following arguments:

> 1.    That the ALJ failed to give controlling weight to the Plaintiff's treating physician, Dr. Grangaard, and that, as result, the RFC determined by the ALJ was inaccurate.
>
> 2.    That the ALJ's hypothetical to the VE did not include all of the limitations supported by the Record.
>
> 3.    That the ALJ failed to fully and fairly develop the Record as he failed to contact Dr. Grangaard, in order to clarify the doctor's opinions.
>
> 4.    That the ALJ improperly evaluated the Plaintiff's credibility, because he did not discuss all of the factors outlined in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984).

We find that all of the Plaintiff's arguments are subsumed within his contention that the ALJ failed to fully and fairly develop the Record, and we agree with that assertion, thereby resulting in our Recommendation that this matter be remanded.

"The ALJ has the duty to develop the record fully and fairly, even where, as here, the claimant is represented by counsel." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000), quoting Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985). In addition, our Court of Appeals has held "that a remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision." Scott ex rel. Scott v. Astrue, 529 F.3d 818,, 822 (8th Cir. 2008), citing Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005), as "remanding because the ALJ's factual findings were insufficient for meaningful appellate review," and Pettit v. Apfel, 218 F.3d 901, 903-04 (8th Cir. 2000)(same). "While a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding, where the deficiency [has] no practical effect on the outcome of the case,' inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis to remand." Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005), quoting Reeder v.

Apfel, 214 F.3d 984, 988 (8th Cir. 2000); see also, Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992).

Here, for reasons we detail, we find that the ALJ's analysis of the Record was so superficial, and perfunctory, as to preclude, in any meaningful way, an informed review of the bases for his decision. We start with the ALJ's treatment of the medical opinion evidence that he addresses in his decision. In effect, the ALJ rejected the medical opinions of the Plaintiff's treating physician, and those of the State Agency consultants, who were both medical doctors. As to the treating physician -- Dr. Grangaard -- the ALJ succinctly expressed his complete appraisal of the doctor's opinion, that the Plaintiff "lacks the attention, concentration, and persistence necessary to perform full time, semiskilled work," [T. 17], as follows:

> I have not given controlling weight to this opinion because the treating physician admits that the claimant's pituitary tumor may not be the cause of his fatigue, and because laboratory tests and examinations show that the claimant's condition is stable. The only abnormality on examination is the claimant's visual fields loss in the left eye. The treating physician's opinion is thus not supported by his objective findings on examination.

Id.

First, there can be little doubt that the Plaintiff has been consistent about his complaints of fatigue and lethargy, as he has reported those symptoms to most of the

doctors who have examined him, or his clinical records.  See, T. 139, 141, 143, 195-97, T. 198, T. 200, [Dr. Grangaard]; T. 140 [Dr. Brattain]; T. 163, 165,[20] 167 [Dr. Leebaw]; T. 177 [Dr. Gumbinas]; T. 188 [Dr. Gorman]; T. 213-15 [Dr. Erickson].

While the Plaintiff's fatigue has not always been described as significant, the Record fails to document any medical source as having rejected those symptoms as medically unfounded and, in fact, many of the doctors have prescribed remedies to abate their effects.  Unfortunately, the ALJ never questioned the Plaintiff as to why he did not reattempt the use of the CPAP, after he acknowledged that the technology had improved some, [T. 163,177, and 231]; engage in a sleep study, [T. 141, 215]; nor did he question the Plaintiff as to the pharmacological effect on his fatigue, if any, of taking the Effexor that was prescribed by Dr. Grangaard.  [T. 197].  If, as it clearly appears, the ALJ had determined that the Plaintiff was not aggressively seeking relief from his fatigue, see, [T. 17]("[T]he claimant has failed to seek adequate treatment for his obstructive sleep apnea."], then such focused inquiries would have been critical to an informed analysis.

---

[20]On October 11, 2004, the Plaintiff reported to Dr. Leebaw that "his energy level [was] very good," and that "[h]e [was] sleeping well."  [T. 165].  However, in his immediately previous, and post, consultations with Dr. Leebaw, the Plaintiff had complaints of lethargy.  See, T. 163, and 167.

Moreover, we do not understand the ALJ to be stating that the Plaintiff does not suffer from significant fatigue, although he does regard the Plaintiff as exaggerating his complaints about that condition.  As noted, the Record is rife with references to the Plaintiff's sleep apnea, and again, no treating source has denied that the Plaintiff experienced that condition, which those same sources recognized as a potentially aggravating source of fatigue.  Rather than address the Record, and isolate potential sources for the Plaintiff's complaints of fatigue, the ALJ simply states that the "claimant's condition is stable."  While true, that is small comfort to the Plaintiff, who has consistently complained of significant fatigue, whether caused by sleep apnea, his pituitary tumor, or some other cause, such as depression, as Dr. Grangaard also suspected.  [T. 197].  Notably, the potential sources of the Plaintiff's fatigue are all medical in nature, and the issue before the ALJ resolved to whether the Plaintiff's level of fatigue precluded substantial gainful activity.

"The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician," see, 20 C.F.R. §404.1527(d)(2), and "[w]hether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight."  Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008), quoting Holmstrom v. Massanari, 270 F.3d

715, 720 (8th Cir. 2001). Here, while determining that Dr. Grangaard's findings were not "controlling," the ALJ fails to disclose whether he extended any weight, whatsoever, to the doctor's opinions, and the reasons expressed for undermining those opinions were plainly neither cogent, nor informative. The ALJ's treatment of the opinions, and the clinical observations, of the Plaintiff's treating physicians is enigmatic, at best.

Indeed, the very same may be said with respect to the ALJ's treatment of the consultative doctors, whose opinions were not meaningfully distinct from those of Dr. Grangaard. One of those consultants, Dr. Gumbinas, is a neurologist who, after examining the Plaintiff's pertinent records, found that "he does have significant fatigue which may be aggravated by sleep apnea and is considered a severe but not listing level impairment." [T. 177]. Since Dr. Gumbinas had not evaluated the diagnosed limitations in the Plaintiff's eyesight, Dr. Gorman subsequently conducted a Residual Functional Capacity assessment, which recognized the Plaintiff's complaints of fatigue, [T. 188]("fatigue has been considered"), and concluded that the severity of the Plaintiff's symptoms "is consistent, in [his] judgment, with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or

habits." [T. 192]. Notwithstanding the consistency of those opinions, with those of Dr. Grangaard, the ALJ gave those opinions "little weight," "as they do not take into account the opinion of the treating physician [i.e., Dr. Grangaard], or treatment notes from the Mayo Clinic." [T. 17].

As a tautological reality, neither Dr. Gumbinas, nor Dr. Gorman, could have considered the assessments, and opinions, of the doctors who had examined the Plaintiff after them, but other than expressing an accurate historical fact, the ALJ does not so much as intimate why, on any substantive basis, the consulting physicians' opinions were entitled to "little weight." See, Hepp v. Astrue, 511 F.3d 798, 806-07 (8th Cir. 2008)("According to 20 C.F.R. §404.1527(c)(2), if the medical opinions in the record are inconsistent with each other, the ALJ must weigh all the evidence."), citing 20 C.F.R. §1527(d). Unfortunately, the ALJ does not provide us a clue as to why the opinions of Drs. Gumbinas, and Gorman, were discredited, apart from the impossibility of either doctor reviewing medical notes and opinions which had yet to be generated.

The ALJ's approach is too facile, too unprincipled, and too impermeable to any principled review, to find acceptance. In point of fact, the opinions of Drs. Gumbinas, and Gorman, are not readily distinguishable from Dr. Grangaard's, and we fail to

perceive anything in Dr. Erickson's report, from the Mayo Clinic, which is appreciably at odds with those of Dr. Gumbinas, Dr. Gorman, or Dr. Grangaard. Following his examination of the Plaintiff, Dr. Erickson reported that "[h]e continues to have significant fatigue and decreased energy level." [T. 214]. We fail to understand how that clinical observation would have been startling to either Dr. Gumbinas, or Dr. Gorman, or to Dr. Grangaard, for that matter.

To be meaningful, an ALJ must disclose his reasoning for accepting, rejecting, and allocating weight, to medical opinion evidence. Where, as here, the ALJ provides a conclusion, unsupported by reasoning, a reviewing Court is deprived of any means to assess the propriety of the acceptance, the rejection, or the weight accorded to critical medical evidence. See, Reeder v. Apfel, supra at 987 ("Although a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency had no practical effect on the outcome of the case, see Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999), the ALJ is not free to ignore medical evidence but must consider the whole record."). Congress could have vested ALJ's with the authority to grant, or deny, Social Security benefits without explanation, but that is not the approach Congress adopted. In the absence of an explication of the reasoning which led to the ALJ's decision, we are obligated to remand.

Beyond the deficiencies in the ALJ's assessment of the medical opinions of Record, we also agree with the Plaintiff, that the ALJ's credibility assessment was fatally flawed, and demands a remand.  In assessing the Plaintiff's credibility, the ALJ reasoned, in total, as follows:

> The medical reports show that the claimant's symptoms are stable with treatment.  There are no findings of neurological deficits.  The claimant has vision loss on the left side, but normal vision in his right eye.  The claimaint's treating physician does not believe that the claimant's fatigue is necessarily related to his pituitary tumor.  I note that the claimant has been diagnosed with obstructive sleep apnea, but has refused to use a CPAP machine, and has not pursued any other treatment for this condition.  The claimant's failure to pursue treatment for his sleep apnea, given that it could very well be the cause of his daytime fatigue, detracts from the credibility of his subjective complaints.  The claimant has a very strong work record. (Exhibit 3D) This fact alone, however, does not outweigh the rest of the evidence, which shows normal hormone levels and stable condition.

[T. 16].

While it may be said "that the claimant's symptoms are stable with treatment," that is small comfort to the Plaintiff, who has consistently complained of significant fatigue and lethargy -- that he has a stable, yet unabated, level of fatigue says nothing about the Plaintiff's degree of disability.

Further, it is accurate to state that Dr. Grangaard was alert to the potential that the Plaintiff's fatigue could be the result of a number of clinical causes, including central nervous system (CNS) disease [T. 197], "conjunctiva possibilities" [T. 197], sleep apnea, the pituitary tumor, and depression [T. 197].   Irrespective of those potential causes, the simple fact is that, according to Dr. Grangaard, the Plaintiff "has significant difficulty sleeping, awakens tired, and feels that day-to-day he's not able to manage any level of vigorous activity beyond several hours." [T. 195].  Given the ALJ's recognition, that the Plaintiff's fatigue has a number of potential sources, we reasonably infer that, in the ALJ's view, the fact that the Plaintiff failed, at least in the ALJ's view, to treat for his sleep apnea undermined his claim of being disabled by his intractable fatigue.

Of course, an ALJ may properly "discount a claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment," Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996), for, "if [his fatigue] was as severe as [he] alleges, [the Plaintiff] would have sought regular medical care seriously." Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).  Quite logically, the failure to seek regular medical care could seriously undermine a claimant's entitlement to disability benefits.  Id.  However, "[a]n ALJ 'must not draw any

- 43 -

inferences about an individual's symptoms and their functional effects from a failure to seek or pursue medical treatments without first considering * * * information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment,' such as '[t]he individual's ability to afford treatment [or obtain] access to free or low-cost medical services." Blakeman v. Astrue, 509 F.3d 878, 888 (8th Cir. 2007), quoting Soc. Sec. Reg. 96-7.

Here, plainly, the ALJ has not disclosed any consideration of the potential that the Plaintiff did not pursue medical treatment for want of an ability to afford the treatment, or for other good reason. We understand, based on the Record presented, that the Plaintiff was laid off in about February of 2005, [T. 235], and was without any income from that date through the date of the Hearing, [T. 229], although his health insurance coverage continued, under COBRA, for eighteen (18) months, [T. 233], and expired in about October of 2006. Id. Indeed, the Plaintiff admitted that he was unable to seek certain medical treatment for want of health care coverage. [T. 232-33]. Moreover, because the ALJ failed to make any inquiry into the subject, we are unable to determine whether the Plaintiff's health care plan afforded benefits for sleep apnea treatment, for example, or whether that treatment was contraindicated by the Plaintiff's other medical conditions. As but one example, the potential relief from

growth hormone treatment was contraindicated by the Plaintiff's tumor, and his difficulties with sleep apnea, and there is no showing, in this Record, that any other modality of relief, for his fatigue, would do the Plaintiff any good. See, e.g., T. 164, 214-15, and 237]. Therefore, we conclude that it was error for the ALJ to infer that the Plaintiff's failure, if any failure there be, to treat his sleep apnea, was wholly volitional, and warranted a serious undermining of his believability.

As for the discrediting of the "strong work record," because of the "rest of the evidence," [T. 16], the ALJ's reasoning is unconvincing when he does not identify what evidence, in particular, outweighs the Plaintiff's unquestionably strong work history. See, Hutsell v. Massanari, 259 F.3d 707, 713 (8th Cir. 2001)(finding that the plaintiff's work record supported the credibility of her disability complaint); O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003)(reversing and remanding a denial of benefits, and noting that the plaintiff's "history shows a fourteen-year record of responsible and well-paying jobs in the computer field."). Here, the Plaintiff has a "strong work history" of holding high-paying employment, and his financial motivation to work should not be so facilely discounted on the basis of ethereal, yet unidentified, evidence.

Accordingly, we are obligated to conclude that the ALJ erroneously rejected the medical evidence of Record, which substantiates the Plaintiff's complaints of severe fatigue and lethargy, and unfairly undercut the Plaintiff's credibility, in order to substitute his own apparent view that, for reasons not disclosed, the Plaintiff's application for benefits should be denied. See, Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008); see also, Pratt v. Sullivan, 956 F.2d 830, 834 (ALJ may not substitute his unsubstantiated lay opinions for those of examining and treating professionals). Moreover, the fatal errors we have identified undercut the validity of the ALJ's other areas of analysis. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some evidence of the claimant's ability to function in the workplace." Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008), quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). "With th[ese] central and potentially dispositive issue[s] unexplained by the ALJ, we have no confidence in the reliability of the RFC upon which the ALJ based his decision." Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004). The same may legitimately be said, here.

We do not suggest, however slightly, that, as the Plaintiff urges, the Record supports an award of benefits to him, for the Record has not been sufficiently developed to form that judgment. Indeed, we are troubled by the fact that some of the

Plaintiff's testimony seems somewhat contrived.  For example, the Plaintiff testified that his termination from employment was because of "extenuating circumstances, like people walking in and finding [him] asleep in [his] chair."  [T. 235].  However, he also testified that he was laid off, and he was given a "severance check," assertedly to "buy [his] silence."  Id.  We find it somewhat implausible, however, that a person could lose his job, due to a state of fatigue which caused him to sleep at work, and yet not inform his treating physicians of that occurrence.  Instead, on March 28, 2005, the Plaintiff reported to Dr. Grangaard, that he "lost his job after a career with Schwab in the 50% employment cut back."  [T. 143].  As a consequence, on this undeveloped Record, we are unable to say that, ultimately, the evidence will not substantiate the ALJ's impression, that the Plaintiff's fatigue would not be disabling if he aggressively seeks available medical relief.

On remand, the ALJ may well wish to make further contact with one or more of the Plaintiff's treating physicians, so as to clarify the extent and degree of his fatigue, as well as its potential amenability to effective medical treatment.  "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record," and "that duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped."  Smith v. Barnhart,

- 47 -

435 F.3d 926, 930 (8th Cir. 2006)[citation omitted].  In fact, "[t]he regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled."  Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006), citing 20 C.F.R. 404.1512(e)("When the evidence we receive from your treating physician * * * is inadequate for us to determine if you are disabled * * * [w]e will * * * recontact your treating physician * * * to determine whether the additional information we need is readily available.").  A simple contact with Dr. Grangaard, by Interrogatory or otherwise, could have resolved whether the Plaintiff's fatigue was amenable to medical modalities that would have allowed him to continue working.

In addition, the ALJ might well resort to a focused consultative examination on the causes, and potential for a clinical amelioration, of the Plaintiff's complaints of intractable and incapacitating fatigue.  See, Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990)("If the ALJ requires additional evidence to make a disability determination, he should order consultative examinations to be performed at the expense of the Social Security Administration."), citing 20 C.F.R. §404.1517(a).  In fact, "[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."  Boyd v.

- 48 -

Sullivan, supra at 736 (8th Cir. 1992), citing Dozier v. Heckler, supra at 276, quoting, in turn, Reeves v. Heckler, 734 F.2d 519, 522 n. 1 (8th Cir. 1984); see also, Freeman v. Apfel, supra at 692.  While we are unable to predict that such contacts with the treating physicians, or consultative examinations, will uncover all of the medical intricacies of the Plaintiff's fatigue and lethargy, doing nothing, other than to speculate that the Plaintiff chooses not to work, is reversible error.  See, Snead v. Barnhart, supra at 839 ("Because this evidence might have altered the outcome of the disability determination, the ALJ's failure to elicit it prejudiced [the plaintiff] in his pursuit of benefits."), citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).

Therefore, we recommend that the parties' cross-Motions for Summary Judgment should be denied, and that the matter should be remanded to the Commissioner for further proceedings consistent with this Report.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Plaintiff's Motion [Docket No. 9] for Summary Judgment be denied.

2.     That the Defendant's Motion [Docket No. 12] for Summary Judgment be denied.

3.     That this matter be remanded to the Commissioner for further proceedings, in accordance with this Report, pursuant to Sentence 4 of Title 42 U.S.C. §405(g).

4.     That, pursuant to the holding in <u>Shalala v. Schaefer</u>, 509 U.S. 292, 297 (1993), Judgment be entered accordingly.

Dated:  February 17, 2009                      _s/Raymond L. Erickson_
                                                Raymond L. Erickson
                                                CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **March 6, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **March 6, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.